```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE SOUTHERN DISTRICT OF TEXAS

 3                           HOUSTON DIVISION

 4   WARD, et al.                  §    CASE NO. 4:23-cv-01708
                                   §    HOUSTON, TX
 5   VERSUS                        §    WEDNESDAY,
                                   §    JUNE 11, 2025
 6   HARRIS COUNTY, TEXAS, et al.  §    2:31 PM TO 4:27 PM

 7                          INITIAL CONFERENCE

 8          BEFORE THE HONORABLE CHARLES R. ESKRIDGE, III
                     UNITED STATES DISTRICT JUDGE
 9
                             APPEARANCES:
10

11       FOR THE PARTIES:              SEE NEXT PAGE

12       COURT REPORTER:               GARRETT COLE

13       COURT CLERK:                  JENNELLE GONZALES

14

15

16

17

18

19

20

21                      TRANSCRIPTION SERVICE BY:

22                      Veritext Legal Solutions
                        330 Old Country Road, Suite 300
23                         Mineola, NY 11501
                     Tel: 800-727-6396 ▼ www.veritext.com
24
          Proceedings recorded by electronic sound recording; transcript
25                  produced by transcription service.
```

```
 1                                  APPEARANCES:

 2     FOR THE PLAINTIFFS:          SUSMAN GODFREY LLP
                                    Jonathan Ross
 3                                  Hayden Hawkins
                                    1000 Louisiana, Suite 5100
 4                                  Houston, TX 77002
                                    713-651-9366
 5

 6     FOR DEFENDANT                HARRIS COUNTY ATTORNEY'S OFFICE
       HARRIS COUNTY, TEXAS:        Gregory Ronell Burnett
 7                                  Suzanne Bradley
                                    1019 Congress Avenue
 8                                  15th Floor
                                    Houston, TX 77002
 9                                  713-274-5224

10     FOR DEFENDANT DR. NAILA      SERPE, JONES, ANDREWS, CALLENDAR
       DHANANI:                     & BELL
11                                  Christopher M. Knudsen
                                    2929 Allen Parkway, Suite 1600
12                                  Houston, TX 77019
                                    713-452-4400
13
       FOR DEFENDANT LICENSED       HARRIS COUNTY ATTORNEY'S OFFICE
14     VOCATIONAL NURSES AND        James Carroll Butt
       DETENTION OFFICERS:          1019 Congress
15                                  Houston, TX 77002
                                    713-274-5133
16

17

18

19

20

21

22

23

24

25
```

```
 1              HOUSTON, TEXAS; MONDAY, JUNE 9, 2025; 2:31 P.M.
 2                   CLERK:  All rise.  The United States District
 3    Court for the Southern District of Texas is now in session.
 4    The Honorable Charles Eskridge presiding.  God save the United
 5    States and this Honorable Court.
 6                   THE COURT:  Thank you, everyone.  Please be seated.
 7                   All right.  I call for hearing 23-1708, Ward v.
 8    Harris County, Texas, et al.  Can I get appearance of counsel,
 9    please?
10                   MR. ROSS:  Your Honor, for the Plaintiff, Jonathan
11    Ross of Susman Godfrey.  And Hayden Hawkins, who will be doing
12    the argument today for Your Honor.  I would also like to
13    introduce Rowena and Gene Ward, the parents -- our clients and
14    the parents of Rory.
15                   THE COURT:  Thank you.  Yes, I remember them.
16    Welcome back.  Thank you for being here.
17                   All right, for Defendants?
18                   MR. KNUDSEN:  Chris Knudsen on behalf of Dr. Dhanani.
19                   THE COURT:  All right.  I'm going to take notes on
20    who is representing who on the defense side.  Thank you.
21                   MR. BURNETT:  And Greg Burnett on behalf of Harris
22    County.
23                   THE COURT:  Sorry?
24                   MR. BURNETT:  Greg Burnett on behalf of Harris
25    County.
```

```
 1              THE COURT:  Oh, Harris County.  Okay.
 2              Mr. Butt?
 3              MR. BUTT:  Good afternoon, Your Honor.  On behalf of
 4    Licensed Vocational Nurses Thomas, Reid, and Sirleaf and
 5    Detention Officers Fuller, Gable, Gamez, Guzman, and Reese.
 6              THE COURT:  Okay, thank you.
 7              MS. BRADLEY:  Just briefly, Your Honor.
 8              THE COURT:  Yes.
 9              MS. BRADLEY:  Suzanne Bradley.  And I represent the
10    County along with Mr. Burnett.  And with me today is intern
11    Nicholas Wesley.  Please stand.
12              THE COURT:  Welcome, sir.
13              MR. WESLEY:  Good afternoon.
14              MS. BRADLEY:  Is it all right that he sits at counsel
15    table?
16              THE COURT:  Of course.  Of course.  I may make him
17    argue.  So we'll see.
18              MS. BRADLEY:  Young minds are very sharp.  And then
19    this is Brian Hrach.  New to our office and most recently from
20    the U.S. Attorney's Office.
21              THE COURT:  Okay, great.  Thank you.  All four Harris
22    County?
23              MS. BRADLEY:  Yes, sir.
24              THE COURT:  Okay.  Thank you.  So, Mr. Butt, do you
25    have a representation of all of the individuals that have been
```

1    named as defendants or is that -- it sounded like you didn't

2    quite have everybody.

3            MR. BUTT:  There are some that have not requested

4    representation as far as I know.  So I do not represent all the

5    individuals.

6            THE COURT:  I guess for all of the individuals that

7    have filed motions that are pending today, are you representing

8    them?

9            MR. BUTT:  Yes, Your Honor.

10           MR. KNUDSEN:  I have one individual, Your Honor.

11           THE COURT:  And who do you have?

12           MR. KNUDSEN:  Dr. Dhanani.

13           THE COURT:  And we have Dhanani.  Of course.  Yeah.

14   Okay.  All right.  Let's see.  And actually as to that first

15   point just on parties at issue, there is a defendant, Kendrick

16   Hafford, who has been served but didn't file a motion to

17   dismiss.  Is that correct?  Maybe people do or don't have

18   knowledge of this because you're not representing them.

19           MR. HAWKINS:  Yes, Your Honor.  I believe Kendrick

20   Hafford has been served and has not made an appearance in this

21   lawsuit.

22           THE COURT:  Okay.

23           MR. HAWKINS:  The remaining defendants I believe were

24   not served, Your Honor.

25           THE COURT:  And so then that's as to Kayla Walton,

1   Sandrel Edmond, Ben Goddard, Demitre or Demitre Johnson, and

2   Roslyn Smith.

3            Mr. Hawkins, do you have knowledge about why they

4   haven't been served?  Do you not know where they are?

5            MR. HAWKINS:  we were not able to locate them, Your

6   Honor.

7            THE COURT:  Okay.  Do you have a motion about that?

8   What are we going to do with them at this point?  Have you all

9   discuss, maybe consider that and let me know.  Of course if

10  you've been diligently trying to find them and still haven't

11  served them, it might have something to do with another means

12  by which to toll.  But time is passing and they still just

13  haven't even been brought in.  Have you conferred -- you've

14  conferred with defendants about what's the last-known address

15  and things like that?

16           MR. HAWKINS:  Yes, Your Honor.  I believe that the

17  County ultimately provided us the addresses that we used.  And

18  we then searched public record once we weren't able to serve at

19  those addresses and we just haven't been able to locate them,

20  Your Honor.

21           THE COURT:  Okay,.

22           MR. HAWKINS:  I can speak to my clients and I'd be

23  happy to address the issue.

24           THE COURT:  Okay.  Why don't you consider that and

25  just give me a status report as to those five in ten days about

 1   what you want to do.  I'm not saying you have to dismiss them,

 2   but think about whether practically speaking you really need

 3   to, want to and can go forward against them.  Okay?

 4              MR. HAWKINS:  Yes, Your Honor.

 5              THE COURT:  Thank you.  All right.  So we have both

 6   statute of limitations issues and qualified immunity issues.

 7   And Harris County has Monell issues.  But they're brought in

 8   sort of different arrays by different collections of

 9   individuals.  And some are officers and some are medical

10   providers.

11              So I think that I would start with Harris County's

12   motion to dismiss unless you all have otherwise discussed it or

13   there's some reason to take them up in a different order.  I

14   guess I would ask Defendants first what the preference is if

15   any.

16              MR. BURNETT:  I can go, Your Honor.

17              THE COURT:  Okay.  All right.  Well, let's start with

18   Harris County.

19              MR. BURNETT:  All right.  So, Your Honor, the --

20              THE COURT:  And you can take it from there or you can

21   also come to the podium if you'd like.  However you'd like to

22   do it.

23              MR. HAWKINS:  Your Honor, would you prefer that we

24   argue each motion individually or would you like all the

25   defendants to go first?

1          THE COURT:  No, no, no.  We're going to take each

2    motion individually.  And to the extent that the motions raise

3    separate issues, we'll probably go back and forth on each of

4    those.  I just try to keep things a little more

5    compartmentalized.  But yeah, you'll be -- for your purposes,

6    you'll be addressing this before you hear from anybody else.

7    All right.  Mr. Burnett?

8          MR. BURNETT:  Yes, Your Honor.  Your Honor, the

9    County has filed motions to dismiss based upon Monell, stating

10   that the Plaintiffs have failed to state a claim against the

11   County based upon the allegations that are in their complaint.

12          As you know, under Monell, Your Honor, they would --

13   Plaintiffs would have to prove that the County had a policy,

14   policymaker created that policy, which was the moving force

15   behind the constitutional violation.

16          It is the County's position that Plaintiffs have

17   failed to sufficiently plead that there is a policy that they

18   located that was the moving force behind the alleged violation.

19   And we also have argued that they have not sufficiently pled

20   that there was any type of persistent pattern that the County

21   has that also causes a constitutional violation.

22          So the gist of the motion to dismiss for the County

23   is basically that there is no policy.  There is actually no

24   custom or practice by the County that the Plaintiffs have

25   pointed out.

```
 1              THE COURT:  And this will be a customer practice
 2   case.  I mean, it's not an allegation that there's --
 3              MR. BURNETT:  Right.
 4              THE COURT:  -- oh, Harris County has a written policy
 5   that says provide inadequate medical care.  That's not what's
 6   at issue.
 7              MR. BURNETT:  Right.  Yes, Your Honor.
 8              THE COURT:  And so it seems to be more of an episodic
 9   acts pleading, although the argument then also has just general
10   maintenance of unconstitutional conditions as well.  Correct?
11              MR. BURNETT:  That's correct, Your Honor.
12              THE COURT:  Okay.
13              MR. BURNETT:  Plaintiffs have pointed out in their
14   compliant in Paragraph 43 of their complaint, they list like
15   seven incidents that they allege inadequate medical care over a
16   four-year period.  Those incidents that they point out, Your
17   Honor, do not constitute any pattern of conduct, much less a
18   pattern of similar violations.
19              We also argue, Your Honor, that those patterns that
20   they point out also are basically conclusory, they are also I
21   would say not only conclusory, they are -- they don't -- it's
22   not specifically alleged how these individuals received
23   inadequate medical care.  It only just says that this
24   individual either was injured or this individual died and they
25   assume it was because of inadequate medical care, which that is
```

 1   not sufficient under Monell to assert a claim, Your Honor.

 2            THE COURT:  So you referenced like the first series

 3   of incidents at Paragraph 43.

 4            MR. BURNETT:  Yes.

 5            THE COURT:  But then there are other -- then there's

 6   public media sources that are public -- Paragraph 44.  And then

 7   Paragraph 45 gathers some or all within the same timeframe.

 8   And then 47 has a couple of other instances listed.  I hadn't

 9   actually counted those up, but I know that in the response

10   briefing it's pointing to 28 violations, correct?

11            MR. BURNETT:  That's correct, Your Honor.

12            THE COURT:  Okay.

13            MR. BURNETT:  And some of those violations, they are

14   pointing out our other lawsuits that are pending.  Those are

15   not final matters.

16            THE COURT:  Right.

17            MR. BURNETT:  Those are really just allegations.  So

18   that wouldn't be a standard that the County could be put on

19   notice regarding those incidents as far as being a persistent

20   pattern or pervasive pattern per se.

21            So the argument with those, Your Honor, is that those

22   other incidents would not amount to an actual pattern because

23   there is not a constitutional violation that has been put on

24   notice.  Those could just be allegations.  They haven't been

25   proven that there was an actual constitutional violation.  They

 1    are just pending matters.

 2              THE COURT:  Okay.  All right.  What else on Monell?

 3    There's arguments as to policymaker and...

 4              MR. BURNETT:  Well, the policymaker, Your Honor --

 5              THE COURT:  And causation.

 6              MR. BURNETT:  -- dealing with the jail is the

 7    sheriff.  That's by law.

 8              THE COURT:  Say that again?

 9              MR. BURNETT:  That's by law.

10              THE COURT:  What?

11              MR. BURNETT:  As far as the policymaker.

12              THE COURT:  Yeah.

13              MR. BURNETT:  It's the sheriff.  There's not a

14    dispute about the sheriff is --

15              THE COURT:  Okay.  And so is it just a question --

16    you do raise the question though about his knowledge.

17              MR. BURNETT:  Yes, Your Honor.  What I pointed out is

18    that in the complaint, it makes assumptions that the sheriff

19    was on notice about all these incidents just because he gave

20    like statements to the media and all that.

21              THE COURT:  Right.

22              MR. BURNETT:  So that's --

23              THE COURT:  That's the thing and that's the point.

24    For purposes of a motion to dismiss, if he's out there talking

25    about things that can be alleged as, well, he's indicating he

1   has subjective knowledge of these problems and is referencing

2   them as such, isn't that enough here as opposed to behind the

3   scenes connecting it up to what pieces of paper were put in

4   front of him that he had specific knowledge of or conversations

5   that he had?

6           For a pleading, he's out there in the press when

7   these types of claims are raised acknowledging --- not saying

8   that it's like -- not acknowledging constitutional violations,

9   but acknowledging there may be a problem at the Harris County

10  jails and we're understaffed and things like that.

11          MR. BURNETT:  Yeah.  And I think that it would have

12  to be his subjective knowledge that he believed that there was

13  constitutional violations.

14          THE COURT:  Well, I agree with you that at the end of

15  the day that's where it gets.  But we're talking about the

16  pleading standard right here.

17          MR. BURNETT:  Yes.

18          THE COURT:  And obviously discovery into that hasn't

19  been allowed.  And so you never have subjective knowledge on

20  the pleading, but you're pointing to things that would show

21  subjective knowledge.

22          MR. BURNETT:  Yes, Your Honor.

23          THE COURT:  Okay.

24          MR. BURNETT:  So even with those matters, Your Honor,

25  I don't think that it's enough as far as to even show a pattern

```
 1    that's pervasive with the size of the Harris County Jail and
 2    how many inmates come in and out.  The number of incidents that
 3    they've pled in here just wouldn't amount to a pervasive
 4    pattern that would put the sheriff on notice that something
 5    needed to be done.
 6              THE COURT:  All right.  There was also -- you had an
 7    argument about subject matter jurisdiction in terms of the
 8    capacity of the Wards to bring action on behalf of their late
 9    son.
10              MR. BURNETT:  Yes.  The survivor claim.
11              THE COURT:  Is that -- are you arguing that --
12              MR. BURNETT:  The survival action?
13              THE COURT:  Obviously not attached to their complaint
14    is any of that material, but it's -- you can get into that in
15    an evidentiary way when it's subject matter jurisdiction.  It
16    looks to me like they've satisfied for purposes now their
17    capacity to bring this suit.
18              MR. BURNETT:  And I agree, Your Honor.
19              THE COURT:  Okay.
20              MR. BURNETT:  At this point I think they have once
21    they supplemented the affidavit.
22              THE COURT:  Okay, all right.
23              MR. BURNETT:  So I think they get there at that
24    point.
25              THE COURT:  Okay, good.  I appreciate that.  Anything
```

 1    -- I'm going to give you a chance on response.  Anything else

 2    you want to let me know in advance before I hear from

 3    Plaintiffs?

 4              MR. BURNETT:  Nothing at the moment, Your Honor.

 5              THE COURT:  All right.  Mr. Hawkins?

 6              MR. HAWKINS:  Good afternoon, Your Honor.  Your

 7    Honor, I want to start with the complaint.  As Your Honor

 8    pointed out, there are 28 different incidents, fairly similar

 9    incidents, of situations where detainees at Harris County Jail

10    were injured and did not receive adequate medical care in

11    response.  That is the allegations, Your Honor.  And as Your

12    Honor alluded to, we will eventually have to prove the

13    allegations we make in this case.  But at this stage, Your

14    Honor, we have alleged fairly similar incidents, numerous ones,

15    that are comparable to what happened to Rory here.

16              But beyond the incidents, Your Honor, as you pointed

17    out, we pointed to public discussions and statements by Sheriff

18    Gonzalez, we pointed to Texas regulatory reports for the TCJS,

19    and we pointed to the DOJ's 2009 report on the conditions at

20    the Harris County Jail.  All of those documents discussed the

21    lack of adequate medical treatment at the jail.

22              Your Honor, we would also direct the Court to the

23    Wagner case where Judge Ellison on motion to dismiss agreed on

24    many of these same points, Your Honor, the same documents and

25    same incidents, that for motion to dismiss purposes, the

1     Plaintiffs there had satisfied the requirement of a pattern or

2     practice under Monell.

3            THE COURT:  Where does the Wagner -- I didn't look

4     into it before coming in.  Where does the Wagner case sit

5     procedurally now?  Do you know?  How far has it advanced?

6            MR. HAWKINS:  Your Honor, last I checked on Pacer,

7     they were in a dispute about joiner.  Because what happened in

8     the Wagner case was there were multiple plaintiffs that joined

9     in that single lawsuit.

10           THE COURT:  Oh, right.

11           MR. HAWKINS:  And then there was I think -- Your

12    Honor, I don't know the number off the top of my head.  But the

13    latest I checked was there were emotions or hearings on the

14    joiner issue, whether there was improper joiner.

15           THE COURT:  Okay.  Okay.  Because that's a collection

16    of individuals with injuries I'm assuming from literally

17    completely distinct instances and maybe involving different

18    individual defendants.  Is that basically what is going on

19    there?

20           MR. HAWKINS:  I have to admit, Your Honor, I don't

21    know full detail.

22           THE COURT:  Don't know, okay.

23           MR. HAWKINS:  And I wouldn't want to --

24           THE COURT:  No, that's okay, that's okay.  But

25    Ellison, Judge Ellison there denied a motion to dismiss in this

 1   respect, correct?

 2           MR. HAWKINS:  Yes, Your Honor.

 3           THE COURT:  Okay.

 4           MR. HAWKINS:  He denied a motion to dismiss.  Again,

 5   on many of the same facts we have here.  And the County doesn't

 6   address that in its motion other than to say we can't point to

 7   lawsuits.  But actually Judge Ellison rejected that argument in

 8   Wagner and said that of course other lawsuits could be another

 9   tool in the toolbelt of showing that there's a pattern of

10   violations at the Harris County Jail.

11           THE COURT:  He said that be -- really like the

12   underlying fact of something happened and injured a person

13   there, that's a fact that's still at issue as to liability for

14   it.  But what's not really at issue is that somebody was

15   harmed, right?  And so you're -- Harris County is aware of who

16   was harmed in their jails.  And that was kind of a basis of

17   Judge Ellison's opinion, correct?

18           MR. HAWKINS:  Right, Your Honor.  That's my

19   understanding.  And part of this goes to -- it speaks to

20   whether or not the County, through Sheriff Gonzalez, had

21   constructive knowledge of this pattern or practice.  And

22   lawsuits, like all of the other things we cite, could go to

23   that constructive knowledge because they establish a pattern.

24           Your Honor, I believe I heard Mr. Burnett say that we

25   had to show that Sheriff Gonzalez had subjective knowledge that

1    these things were happening.  I don't think that's quite right,

2    Your Honor.  I think if we're establishing a pattern or

3    practice, we can point to constructive knowledge based on a

4    pattern of practice.

5         THE COURT:  What do you mean by that?  Because I

6    always sort of think of it in terms of a pattern and practice

7    as a way of implying subjective knowledge because it's

8    happening so pervasively.

9         MR. HAWKINS:  Right.  Your Honor, my understanding --

10        THE COURT:  Maybe that's not quite the principle that

11   underlies it, but the person in charge is going to be aware of

12   something that's happening frequently on important issues.  Go

13   ahead.

14        MR. HAWKINS:  Your Honor, my understanding of the

15   legal standard is that we can show a persistent and widespread

16   practice to establish a pattern.  But we do have to show that

17   the policymaker had actual or constructive knowledge of that

18   pattern.  And we can establish constructive knowledge by

19   showing that under the Panetti case if they had been exercising

20   diligence, they would have discovered what happened.  And that,

21   Your Honor, I believe in the Panetti case they stated that one

22   way to satisfy constructive knowledge would be widespread

23   publicity of the constitutional violations.

24        And so,  Your Honor, we would contest that Sheriff

25   Gonzalez has to have actual knowledge of the pattern because we

1    can point to a pattern that establishes he had constructive

2    knowledge.  Because if he had investigated, he would have

3    discovered the conditions.  Otherwise, a policymaker would be

4    able to bury their head and say they had no subjective

5    knowledge, Your Honor.

6              THE COURT:  Okay.  Mr. Burnett, we didn't really take

7    up in your argument as to -- I guess I would say it this way.

8    Assuming that the pleaded facts are true, whether they amount

9    to a constitutional violation as in the injuries were severe

10   enough and should have been treated and it led to his death, et

11   cetera, et cetera.  Is there anything that -- and I'm trying to

12   do this in a way that says to the other individual defendants

13   I'm going to give you full argument on the qualified immunity

14   type issue, but as to the Monell issue for Harris county, is

15   that at issue or are you more looking at it in terms of you

16   can't point to a policy, you can't point to a policymaker or

17   show causation?  Do you see what I'm trying to say there?  And

18   if you want to argue that separately.

19             Mr. Hawkins, do you have anything else?  I may come

20   back to you just depending on what they have to say.

21             MR. HAWKINS:  Your Honor, if you don't have any other

22   questions, I'm...

23             THE COURT:  I'll let you know.  Thank you.  That's

24   why I'm trying to figure out who is going to argue first and

25   take the first run at the facts is important.  So go ahead.

1          MR. BURNETT:  All right.  I'm going to hit just a few

2    points, Your Honor.

3          THE COURT:  Sure.

4          MR. BURNETT:  As far as with the Wagner case, that's

5    a more broader case.  It involves suicides, inmates-on-inmates

6    violence, guard-on-guard violence.  And it just was --

7          THE COURT:  Well, this was inmate-on-inmate violence.

8    That's what's alleged.

9          MR. BURNETT:  That's what it started from, yes.

10         THE COURT:  That's what it started.

11         MR. BURNETT:  Yes.

12         THE COURT:  And then it goes to -- then the actual

13   allegations here are -- it's not about protecting from that

14   type of violence then, but it's the medical care and who is

15   seeing what after the fact, right?

16         MR. BURNETT:  Right.  Yes, yes, Your Honor.

17         THE COURT:  Okay.  Go ahead.

18         MR. BURNETT:  And I will say that Judge Rosenthal

19   just had a case not too long ago that involved pretty much the

20   same issues that's in the Wagner case dealing with multiple

21   cases that seem unrelated.  And her opinion was that those

22   cases were just hearsay regarding those matters.

23         Also I want to say, Your Honor, regarding the

24   County's liability, if it comes down to the individuals, as you

25   know, there is no respondent --

```
 1              THE COURT:  Right.  And so, you know, if they make
 2    their argument and there's no constitutional liability, well
 3    then of course there's nothing that Harris County could be
 4    responsible for.
 5              MR. BURNETT:  Correct.
 6              THE COURT:  I was just wanting to know whether Harris
 7    County is itself arguing that or you all work together, kind of
 8    represent a lot of the same clients at different times.  And so
 9    I trust I'm going to get argument on that from others.  I just
10    specifically from Harris County on its motion.  Am I hearing
11    that argument --
12              MR. BURNETT:  That would be an argument, Your Honor.
13    And also if there is no constitutional violation by any of the
14    deputies, then Harris County would have no liability also.
15              THE COURT:  Okay.  All right.  Thank you.
16              MR. BURNETT:  All right.
17              THE COURT:  And did you have anything else that you
18    wanted to let m me know?
19              MR. BURNETT:  No, Your Honor.
20              THE COURT:  All right.  Mr. Hawkins, anything
21    further?  Obviously we're going to get into the facts, the
22    specific facts pleaded with the individuals.  So I don't know
23    that we need to do anything on that now.  But as to what you've
24    heard, is there anything further you want to let me know?
25              MR. HAWKINS:  No, Your Honor.
```

```
1              THE COURT:  Okay.  All right.  So then let's turn
2   next to we have two separate motions, one by Officer Fuller and
3   then another by all of the other officers jointly.  And then we
4   have Dhanani's motion and then we have two motions from what I
5   would characterize as the jailhouse nurses.
6              So taking this up, shall we take the officers first?
7   In fact, let's do go with the officers unless there's a reason
8   to go with the medical personnel first.
9              And Mr. Butt, can I ask -- not look back -- actually,
10  I've got Fuller's here.  Did you file -- yeah.  You are counsel
11  for both the Fuller motion on its own and then also the other
12  motion for all of the other officers?
13             MR. BUTT:  Yes, Your Honor.
14             THE COURT:  Is there a reason why they came in
15  separately?  It doesn't matter to me.  I'm just wondering.
16             MR. BUTT:  They came in that way and various times.
17             THE COURT:  Okay.
18             MR. BUTT:  So Fuller came in before the others.
19             THE COURT:  Okay.  That makes sense.  All right, go
20  ahead.
21             MR. BUTT:  Well, I'm not going to belabor the
22  equitable tolling issue, but I would say between May the 8th to
23  the 11th, 2021 and September of 2024 is three-and-a-half years.
24  And that's a long stretch to use a doctrine that is to be
25  sparingly used.  So I would submit that it's a stretch and I
```

1   would urge the Court to look at the equities for the defendants

2   in this case (indiscernible) to answer something nearly four

3   years in the past.

4          THE COURT:  I hear that.  What's your argument though

5   about -- I mean the -- well, the representatives of Plaintiffs,

6   the Wards, his parents, they don't have a way to know who the

7   individuals are.  In their open records request as I understand

8   it and from what's been submitted to me that they were seeking

9   that information several times within the two-year period and

10  then continued following up on that after the two-year period.

11  And so what's the argument there?  What more could they have

12  done?

13         MR. BUTT:  I did not argue that they were not

14  reasonably diligent.

15         THE COURT:  You would not argue that.

16         MR. BUTT:  I did not.

17         THE COURT:  Okay.

18         MR. BUTT:  But I did argue that they did not show

19  extraordinary circumstance.

20         THE COURT:  Okay.

21         MR. BUTT:  That's the balance of equity that I am

22  looking at.

23         THE COURT:  From the -- Mr. Hawkins, if you don't

24  have top of mind, you can let me know when you get to your

25  argument because I didn't look this up.  From when you got

1    notice of individual identities to when you amended the

2    complaint, how much time passed?

3            MR. HAWKINS:  Your Honor, we received -- the first

4    time we learned in discovery about these individual defendants

5    was February of 2024.  But we received partial identities.  At

6    that point we met and conferred with Suzanne and Greg and they

7    ultimately provided the identities, but we did not have a

8    complete list at the time.  We received a complete list in June

9    of 2024 and the amended in July of 2024, Your Honor.

10           THE COURT:  Okay.  All right, thank you.  Mr. Butt,

11   go ahead.

12           MR. BUTT:  So the incident upon which the second

13   amended complaint rests is a period of four days in May of 2021

14   beginning on the 8th of May.  And on that day, Mr. Ward

15   sustained injury, causing a laceration in the back of the head

16   and a black eye on his right eye and was taken to the medical

17   infirmary at the Harris County Jail.  And at that time

18   according to the complaint, he was treated by licensed

19   vocational nurses Donna Reid and Tamica Thomas.  And that's

20   Counts 13 and 11.  Licensed vocational nurses do not diagnose

21   injuries.  They do not have that authority in Texas.  They work

22   under registered nurses and doctors.

23           And according to the complaint from that visit on the

24   8th, he was provided naproxen and Pedialyte and bandaged and

25   the wound was cleaned or cleansed.

```
 1              So then come the involvement of the detention

 2    officers, the five whom I represent.  After he was treated, he

 3    was then videotaped in a hallway near an elevator.

 4              THE COURT:  And let me ask on that.  There are

 5    pictures that are screenshotted in the complaint.  I also saw

 6    them attached to some of the email correspondence seeking like

 7    public records or identification.  So Plaintiffs obviously have

 8    that video.  I'm not sure that it's been submitted to me.  Has

 9    it been submitted to me at this point?

10              MR. HAWKINS:  No, Your Honor.  But I would be happy

11    to submit the videos.

12              THE COURT:  No, I don't want to do anything that

13    would convert it to a summary judgement, although I'm happy to

14    actually -- you know, if the parties wanted me to review it, I

15    would.  I just want to make sure I'm just looking at -- I've

16    got pictures and I've got written allegations of what is in the

17    videotape that neither side has submitted that to me yet.

18    Correct?

19              MR. HAWKINS:  Correct.

20              THE COURT:  Okay.

21              MR. HAWKINS:  Your Honor, I would add I believe in

22    the McWilliams case you considered whether a video could be

23    considered for a motion to dismiss.  And because those videos

24    are referenced in the compliant, I think Your Honor does have

25    that ability to look at those videos.
```

```
 1                THE COURT:  I could.  Yeah.
 2                MR. HAWKINS:  So if you want to, Your Honor, I'd be
 3      happy to provide them.
 4                THE COURT:  In McWilliams it was given to me.  And so
 5      if it was given to me, I went ahead and took a look at it.  And
 6      here it hasn't.  And I'm content to just let the complaint
 7      speak for itself.  I'll obviously be -- well, presumably I'll
 8      review them at some time.  I definitely will because not
 9      everybody has moved to dismiss yet.
10                Okay.  Go ahead, Mr. Butt.
11                MR. BUTT:  So these five detention officers whom I
12      represent who were present around the elevator in the hallway,
13      and they see or witness Mr. Ward fall on the floor.  Two of
14      them assist him up.  And there is an allegation that they also
15      observed him vomiting.
16                THE COURT:  Yes.
17                MR. BUTT:  Your Honor, now the claim against them,
18      the 14th Amendment claim is one of deliberate indifference.
19      And that is a very high standard.  It's more than medical
20      negligence and malpractice or negligence of any sort.  It is
21      subjective knowledge of a serious harm that caused serious
22      medical injury.  So it's a very high burden, subjective
23      knowledge (indiscernible) risk of serious mental harm.
24                I submit that based upon the allegations in this
25      complaint, watching a man fall on the floor, helping him up and
```

 1    observing him vomit, that does not satisfy the standard of

 2    deliberate indifference.  And it also say that the actual

 3    unfortunate demise four days later according to the Plaintiff

 4    from a brain bleed, internal hemorrhage, is an occult injury.

 5              THE COURT:  Is what?

 6              MR. BUTT:  An occult.  And vomiting in and of itself

 7    is not a serious medical need, nor is a laceration on the head.

 8    So to impose liability on these five detention officers under

 9    that standard of deliberate indifference when they have not had

10    any responsibility in the intervening three days to observe him

11    or to check his welfare or do periodic grounds to ascertain how

12    he is doing is really a stretch of plausibility.  And they

13    should not be saddled with this burden of deliberate

14    indifference for a very untoward and (indiscernible) outcome

15    that unfortunately was his.  So...

16              THE COURT:  On the McWilliams case that was just

17    referenced by Mr. Hawkins, Mr. Butt, do you -- was that a

18    Harris County Jail case or was that a Houston Jail?

19              MR. BUTT:  I don't remember that case being mine, so

20    I don't know.

21              THE COURT:  Maybe, Brandon, can you look?

22    McWilliams.  It will either be versus HPD or Harris County.

23              That one, Mr. Butt, have you reviewed it just by

24    chance?

25              MR. BUTT:  No, no.

1              THE COURT:  Okay.  So that one was the decedent came

2    in.  He was very obviously inebriated.  But what he hadn't told

3    anyone was that when it looked like he was going to get

4    arrested, he had swallowed a balloon that had heroin or cocaine

5    or something.  And ten hours later, that came undone or

6    ruptured in his stomach or intestines and he subsequently and

7    quite obviously died because of that.  But he wasn't presenting

8    with anything other than inebriation and public intoxication.

9    And here just the -- the body slam report and the blow to the

10   head that's known and then to move him to one of the holding

11   cells -- so he went to his first holding cell and then 20

12   minutes later or so the officers needed to put him a wheelchair

13   to take him to another holding cell.  And he's laid out on the

14   floor and then he stands over a trash can and vomits with 11

15   officers there.  And then he's put in another holding cell and

16   he vomits twice.  And then he's brought to another holding cell

17   and he vomits again.  And then he's moved to a solitary cell.

18             I mean, I know enough to know about that that says at

19   a minimum that's a serious concussion.  You're just not

20   vomiting after a head blow like that but for a concussion.  And

21   I say that as only a layperson based on what I knew even before

22   reading a lot of these cases coming onto the bench.

23             But you have officers that are seeing this repeated

24   pattern of conduct over a relatively short duration.  And so I

25   have concerns about that.  So tell me what you think.

1        MR. BUTT:  Well, you're saying from the benefit of

2    omissions and hindsight that we can certainly agree that it was

3    a prelude to his demise.  Nonetheless, you're attributing that

4    knowledge to every one of these five people.  And that's a big

5    stretch of plausibility, Your Honor.  So I submit that with

6    subjective knowledge --

7        THE COURT:  That's always hard.  It's like I

8    completely agree.  I can't assess what the result is just

9    simply looking back in hindsight.  I'm trying to look forward

10   as it goes along.  Okay.  All right.

11       McWilliams was City of Houston.  That's what I

12   thought.  The McWilliams case.  So that was not Harris County.

13       MR. BUTT:  I didn't --

14       THE COURT:  Okay.

15       MR. BUTT:  But I will say that the imposition of

16   liability on people that actually assisted and placed him

17   upright, Guzman and Gamez, should not -- should not hold.  Nor

18   should this collective pleading that is held against all five

19   of them to exist.  It's assuming that they know that he has

20   been body slammed and that he's had this and that medical

21   treatment.  How did they know medical treatment?  That is not

22   within their sphere of knowledge.

23       THE COURT:  Right.  Anything else?  And then I'll

24   hear from Mr. Hawkins.

25       MR. BUTT:  No.

```
 1              THE COURT:  All right, Mr. Hawkins.  And Mr. Butt,
 2    I'm sure you'll have more time on your feet in just a moment.
 3    Go ahead.
 4              MR. HAWKINS:  Your Honor, I would start with directly
 5    addressing Mr. Butt's point that this was not (indiscernible)
 6    knowledge.  As alleged and as identified in Harris County
 7    documents we received, the officers were all trained in
 8    identifying medical emergencies.  So they were not operating as
 9    just laypeople.  But, Your Honor, even if they were operating
10    as laypeople, it's obvious the injuries that Rory had were
11    serious and life-threatening.  Even setting aside whether or
12    not they saw or knew of him vomiting, Your Honor, what did the
13    officers see when they saw (indiscernible)?  They saw him fall
14    to the floor, exiting a wheelchair, unable to walk on his own.
15    They saw that he had a gash on the back of his head that had
16    been covered with a bandage.  They saw that he had a black eye
17    and bruising as indicated in the medical records.  And that
18    knew he had just left the clinic 30 minutes earlier, Your
19    Honor.
20              So what they saw, what those officers saw was a man
21    in medical distress.  They did not need to know that he had
22    vomited before.
23              But some of those officers did know that he vomited,
24    Your Honor.  Gamez and Guzman, after Mr. Ward exits the holding
25    cell after being watched by the 11 officers, Gamez and Guzman
```

```
 1    direct him to an elevator.  After he has been standing over a
 2    trash can apparently vomiting for several minutes in the corner
 3    of the room, they direct him to an elevator and he again falls
 4    to the ground, Your Honor.
 5            Now, Mr. Butt characterized that as they were simply
 6    propping him up and helping him up.  But that is not what
 7    happened, Your Honor.  This was a man that they knew could not
 8    walk.  They already saw him fall.  They saw the obvious
 9    injuries to his head.  And what did they do when he fell to the
10    floor?  They picked him up, Your Honor.  They did not give him
11    any medical treatment whatsoever.  And we would -- the Ward
12    family would assert, Your Honor, that that was deliberate
13    indifference.  That when faced with obvious injuries, they were
14    required to do something.
15            THE COURT:  Okay.  All right.
16            MR. BUTT:  May I respond, Your Honor?
17            THE COURT:  Of course.  Anything further, Mr.
18    Hawkins?
19            MR. HAWKINS:  Your Honor --
20            THE COURT:  Why don't you just stay on your feet?
21    Let's hear what Mr. Butt says and you all can go back and forth
22    on this.  Go ahead.
23            MR. BUTT:  The five detention officers should be able
24    to rely upon the fact that he had just been seen, observed,
25    treated by appropriate medical staff.  So it's contrary to the
```

1    facts to say that they should recognize this as a medical

2    emergency.

3         My colleague just gave me a case that is from 2019,

4    Green, where an inmate had meningitis, a neurological disease

5    affecting his brain.  He vomited, had a fever, died within

6    three hours of arrival at the jail.  And the court dismissed

7    that as failing to state a claim.

8         THE COURT:  Of course.  And that one strikes me as

9    being somewhat similar to McWilliams that I just mentioned,

10   which I dismissed because the circumstances of what might be

11   problematic there aren't known and so treatment within what was

12   presenting was given.  As opposed to here, the body slam, the

13   head blows and things that had occurred that are actually what

14   was contributing to the problem that was not in fact diagnosed

15   at the time.

16        And I understand medical negligence in and of itself,

17   that's not something that amounts to deliberate indifference or

18   allows a claim to proceed.  But there's a lot of context in

19   terms of whether it's something that could be characterized as

20   simply medical negligence or oh, you just didn't do quite

21   enough as opposed to oh, you knew subjectively a whole lot and

22   you did nothing at all.  And that's the balance that I am

23   trying to figure out here.  Your thoughts on that?

24        MR. BUTT:  But speculative what they knew.  And my

25   understanding is the detention officers do not get to read

1     medical records.  That's none of their business.  It's HIPAA

2     protected.  So assuming that they had access to that is a

3     stretch.

4              THE COURT:  All I have at this point are the

5     screenshots.  And, you know, it looks concerning.  It's also

6     surprising that there's -- there are 11 -- it's strange to me

7     that outside the door -- and he's collapsed on the ground -- 11

8     of them are standing there watching, looking.  And the pleaded

9     record is that none of them did anything further.  And then

10    there's the other series of pictures of him struggling, one of

11    him vomiting in the trash can, another down on his hands and

12    knees, needing assistance.  And then three pictures in his

13    cell, which I take was where he was confined in solitary.

14             MR. BUTT:  And, Your Honor, for those --

15             THE COURT:  So there's a lot of -- I'm looking at

16    this and I'm gathering a lot of knowledge about what's going

17    on.  And they're there personally watching it.  I'm looking at

18    this and I'm gathering a lot of knowledge about what's going

19    on.  And they are there personally watching it.

20             MR. BUTT:  The allegation is not that they are

21    watching him in every one of these individual holding cells.

22    He's alone in those cells and being videotaped.  That's --

23             THE COURT:  No, I understand that.  Mr. Hawkins?

24             MR. HAWKINS:  Your Honor, I would point the Court to

25    the Ford v. Anderson County case where the Court found there

1    that because the Plaintiff had been placed on medical

2    observation, that indicated to the officers, that was another

3    notch in the belt that they had the awareness that he was

4    facing a serious risk.  I take Mr. Butt's point to mean that

5    the officers could rely on what had happened at the clinic, but

6    that is not the case in the Ford case, Your Honor.  And there,

7    there were actually officers that interacted with the

8    plaintiff, or should I say the decedent, after she had received

9    medical treatment and they witnessed her vomiting and unable to

10   walk.  And they left her in her cell and afterwards she died

11   and they were found to be deliberately indifferent.

12            THE COURT:  But she was on medical observation?

13            MR. HAWKINS:  Yes, Your Honor.

14            THE COURT:  And was Mr. Ward here, the decedent?

15            MR. HAWKINS:  Your Honor, I would say that he had

16   left the medical clinic recently.

17            THE COURT:  Yeah.

18            MR. HAWKINS:  And I can't speak with certainty about

19   this, Your Honor.  My understanding was he was being

20   transitioned back to his regular cell.  And so he was in the

21   process of going through holding cells.

22            THE COURT:  Yeah.  Okay.

23            MR. HAWKINS:  So I would say the Ford case suggests

24   from the Fifth Circuit that his status as having left the

25   medical clinic further informs the officers that he had some

1   sort of medical event happening.  And then on top of that, Your

2   Honor, they observed him laying there injured.  And that's

3   deliberate indifference, Your Honor.  And for that proposition

4   I would point you to the Austin case where a detainee fell out

5   and vomited and the guards did nothing.  Although in that case,

6   Your Honor, some medical aid was actually rendered.  But the

7   guards were still found deliberately indifferent because they

8   did not respond to the actual medical emergency at hand by

9   summoning 911.  And, Your Honor, I would --

10              THE COURT:  What is it that you -- what should they

11   have done?  What's ultimately or what are you thinking the

12   argument is going to be?  You saw this, you should have -- you

13   saw X, you should have done Y.  And the Y is what?

14              MR. HAWKINS:  Your Honor, they should have either

15   called an ambulance, brought him to a hospital, or brought him

16   back to the clinic.  What they shouldn't have done is what they

17   did.  They did absolutely nothing whatsoever, Your Honor.  And

18   we would posit that any amount of care beyond that, we could

19   have a different situation.  The fact is they never did

20   anything, Your Honor.

21              And, Your Honor, I wanted to circle back.  You

22   mentioned the McWilliams case.  And you noted this earlier.

23   And I would -- the Wards would advance that McWilliams if

24   anything is helpful to our case, Your Honor.  Because you

25   emphasized there that there was no outwards signs of injury, no

 1    manifest physical symptoms.  Obviously here Mr. Ward had many

 2    physical manifested symptoms.

 3              THE COURT:  Yeah.  That's the thing.  And I've

 4    watched -- we watched, scrolled through 11 hours of video on

 5    that one.  And it never really looked like anything other than

 6    intoxication.  And really what was at issue was was somebody

 7    just checking frequently enough to see what his status was.

 8    And the video, although light and cursory, people were walking

 9    by on rounds and checking.  But that's different than

10    subjective knowledge about the types of things that you're

11    pleading here.  Just a very different factual set.  Okay?

12              Mr. Butt, anything else?

13              MR. BUTT:  Sure.  Your Honor, Mr. Ward did not

14    immediately die.

15              THE COURT:  Right.

16              MR. BUTT:  We have three intervening days.  And it's

17    total speculation to say if they had just taken him back to the

18    clinic, he would still be alive.

19              THE COURT:  Well, that's ultimately -- you know, for

20    sure -- I have no idea what actual injuries were -- there was

21    obviously blunt force trauma to the head and he had a brain

22    bleed and things like that.  But in terms of from the moment

23    his head got cracked on the floor whether a medical expert

24    would say he was a goner, with all due respect to the

25    Plaintiffs.  And maybe that's what the medical evidence will

1    prove out.  But if it doesn't, then the question is what should

2    have been being done for him in the ensuing moments.  And

3    there's going to be a whole medical causation type issue in

4    this case if it proceeds.

5           And I was saving this because I think it's more

6    pertinent to the medical personnel.  But when it goes -- when

7    he is ultimately taken to the hospital, what's excerpted in the

8    complaint is that the doctors who diagnosed him diagnosed

9    obvious signs of head trauma.  But that's a diagnosis by

10   medical personnel so I'm not necessarily ascribing that --

11   that's why I haven't brought it up with the officers.  But once

12   he gets to the hospital offsite, the first person to look at

13   him are like the many obviously has head trauma, right?

14          MR. BUTT:  He has a bandage on the back of his head.

15          THE COURT:  Right.  I think that -- I'm reading it as

16   them seeing more of a concern than oh, he has a bandaged head.

17   But maybe that's what it was.  And then they diagnosed him with

18   the brain bleed, yeah, which had gone not diagnosed previously.

19   And again, you're talking to me on behalf of the officers right

20   now.  And I'm not saying that they're supposed to be doing

21   medical procedures themselves.

22          MR. BUTT:  But we know from Natasha Richardson that

23   brain bleeds manifest in very strange ways.  And assuming that

24   they would have recognized that this was a head trauma case and

25   it needs emergency care is a far stretch of plausibility.

```
 1              THE COURT:  Okay.  All right.  Mr. Hawkins, anything
 2   last as to the officers?
 3              MR. HAWKINS:  Your Honor, whether or not the officers
 4   knew that Rory had a brain bleed or a traumatic brain injury,
 5   we would advance that they should have known that.  But even if
 6   they didn't, what they knew was that he was facing a severe
 7   medical crisis, Your Honor.  If someone is bleeding from the
 8   back of their head, has a black eye --
 9              THE COURT:  And also from his ears.  Right?  I mean,
10   that's what's pleaded.
11              MR. HAWKINS:  Witnesses reported that he was bleeding
12   from his ears after he was attacked.  There's -- we haven't
13   seen an indication in the record that he -- I suspect that was
14   cleaned while he was in the clinic, but we don't have any
15   certainty of that.
16              THE COURT:  Okay.  Keep going.
17              MR. HAWKINS:  But, Your Honor, he -- when the
18   officers saw him, they saw him lay on the floor.  Some of them
19   saw him stand over a trash can and apparently vomit.  And they
20   saw him unable to walk.  As Your Honor alluded to earlier, it
21   does not take a medical expert to know that a crisis is
22   unfolding before you and under those facts, Your Honor.
23              And, Your Honor, as to what the doctors saw when Rory
24   arrived at the hospital, first he was completely unresponsive,
25   Your Honor, because he was found unresponsive in his cell.  And
```

```
 1    when he arrived at the hospital, the medical records note that

 2    he had bruising on his right eye, contusions, a hematoma, and a

 3    laceration on the back of his head.  And they noted, the

 4    doctors, that there were obvious facial injuries, Your Honor.

 5              THE COURT:  Okay.

 6              MR. HAWKINS:  And he did ultimately die from a brain

 7    bleed.

 8              THE COURT:  Yes.  All right.  Thank you all very

 9    much.

10              MR. BUTT:  One more point.

11              THE COURT:  Of course, Mr. Butt.  Go ahead.

12              MR. BUTT:  So the notations from the hospital that

13    have all of these findings, but they are not necessarily

14    limiting it to this initial incident.  So there is no telling

15    what happened between the 8th and the 11th of May.  So

16    attributing it all to the 8th I would say is not plausible.

17              THE COURT:  Okay.  All right.

18              MR. HAWKINS:  Your Honor, what happened between the

19    8th of May and the 11th of May, video evidence shows that for a

20    large portion of it he simply sat in --

21              THE COURT:  In solitary?

22              MR. HAWKINS:  Yes, Your Honor.  He was brought out

23    for a cleaning, a short cleaning by the medical -- defendants

24    that were sued.  But, Your Honor --

25              THE COURT:  Well maybe, I mean, Mr. Butt is arguing
```

1  that it may be speculative to connect three days back to day

2  one.  But as you've pleaded it as there is an uninterrupted

3  timeline where nothing else happened to him.  And so something

4  else you don't know, but as pleaded you've said this happened

5  on day one and on day three he died because of it and nothing

6  changed.  And you've pleaded all along he should have been

7  diagnosed, right?

8            MR. HAWKINS:  Yes, Your Honor.

9            THE COURT:  Okay.  What else?  If anything.

10            MR. HAWKINS:  That's all, Your Honor.

11            THE COURT:  Yeah, okay.  All right.  All right.  So

12  as to -- thank you all.  So that's the officers.  There's no

13  other officer -- detention officer motions or anybody arguing

14  those.

15            MR. BUTT:  No, Your Honor.

16            THE COURT:  I've got that.  Okay.  All right.  So

17  then we have motions, one by the doctor and then two that are

18  by different nurses.  So do we want to take the doctor first?

19  All right.  So Mr. -- not Mr., Dr. Dhanani.

20            MR. KNUDSEN:  That's correct, Your Honor.

21            THE COURT:  Her motion.  Go ahead.

22            MR. KNUDSEN:  Dr. Dhanani --

23            THE COURT:  And let me just make sure, Dr. Dhanani

24  raised a statute of limitations only.  It looks to me like the

25  nurses also asserted qualified immunity, but Dr. Dhanani did

1   not.

2               MR. KNUDSEN:  Dr. Dhanani did not, Your Honor.

3               THE COURT:  All right.  Okay.  Go ahead.

4               MR. KNUDSEN:  And the reason is she is not a state

5   employee, Your Honor.

6               THE COURT:  Oh, well, that would do it.  Okay.

7               MR. KNUDSEN:  She is employed by a physician group

8   contracted by Harris County.

9               THE COURT:  Okay.

10              MR. KNUDSEN:  So we didn't assert qualified immunity.

11              THE COURT:  So she is on contract.  And then she --

12   but then she provides her services at the jail on that contract

13   basis.

14              MR. KNUDSEN:  Correct, Your Honor.

15              THE COURT:  Okay.  And that's interesting.  And the

16   state shield of qualified immunity doesn't pertain on that type

17   of relationship?

18              MR. KNUDSEN:  I've researched it exhaustively,

19   unfortunately.

20              THE COURT:  Okay.

21              MR. KNUDSEN:  The Fifth Circuit has recently come

22   down and said no.

23              THE COURT:  Oh.  Oh what basis did they say that if

24   you recall?  If you recall.

25              MR. KNUDSEN:  Kind of a -- if I recall, it was they

1    don't have the justifications that a governmental entity have

2    as putting taxpayer funds at risk that private entities have.

3    Part of the analysis was insurance and other things that --

4              THE COURT:  Is that right?  Like the contract doesn't

5    have an indemnity clause if you --

6              MR. KNUDSEN:  The County will not indemnify.

7              THE COURT:  Okay.  So it's just up to her and her own

8    malpractice insurance is the way that works.

9              MR. KNUDSEN:  Correct, Your Honor.

10             THE COURT:  Well, that makes sense.  Okay.

11             MR. KNUDSEN:  And I know the analysis is much more

12   intensive than --

13             THE COURT:  The Fifth Circuit will be glad to know.

14   I think that makes sense.  Okay, good.  All right.

15             MR. KNUDSEN:  But unfortunately we are not here

16   asserting that.  But we do assert statute of limitations.

17             THE COURT:  Statute of limitations.  All right.

18             MR. KNUDSEN:  Yes, Your Honor.  so it's unclear, but

19   I think the single date according to the complaint that Dr.

20   Dhanani saw Mr. Ward was on May 8th, 2021.  That's the day of

21   the attack when he was taken immediately to the clinic.

22   According to Plaintiff's, clinic, he was there from 3:51 to

23   5:12 p.m.

24             THE COURT:  Yes.

25             MR. KNUDSEN:  He was assessed and prescribed

```
 1    medications and then he was sent I guess back to his cell.  So
 2    Plaintiffs filed --
 3              THE COURT:  And let me just ask, she had full
 4    authority to ask for x-rays or send him off-site for anything
 5    if she wanted to, if she had in her judgment the reason to do
 6    that, she had the ability to do that, correct?
 7              MR. KNUDSEN:  Yes, Your Honor.
 8              THE COURT:  Okay.  Go ahead.
 9              MR. KNUDSEN:  This isn't a part of our motion, Your
10    Honor, but a lot of times there's neurological exams that don't
11    required -- you know, there are precursory exams that people do
12    to determine whether there has been a neurological injury.
13    We'll get into all of that if we have to one day.  But that's
14    not what we have before the Court today.
15              THE COURT:  Okay.
16              MR. KNUDSEN:  Plaintiffs filed the first lawsuit just
17    against Harris County I guess on the eve of limitations.  And
18    then about 14 months later Dr. Dhanani was added to this
19    lawsuit.  We have filed a motion for limitations based on the
20    two-year statute of limitations.  This is 14 months late.
21    Equitable tolling has obviously been brought up.
22              Now, like the statute of limitations, 1983 looks to
23    the state court equitable tolling principles.  And Texas is
24    very strict on equitable tolling, as is the Fifth Circuit.  But
25    under Texas there is a recent case which we cite in our reply
```

1    fairly extensively.  It's Levinson Alcoser Associates f. El

2    Pistolon.  And that's a 2023 case for the supreme court.  And

3    it takes us through the analysis of equitable tolling.  And it

4    begins with the relevant statutory text.  The supreme court

5    will not -- or the State of Texas will not apply equitable

6    tolling if it is violative of a statutes text.  That applies to

7    DTPA.  In the supreme court case it references and examples the

8    DTPA.

9            THE COURT:  Right.  And you link that to the medical

10   negligence?

11           MR. KNUDSEN:  Yes, Your Honor.  And so that's where

12   we go with that, is that if the equitable tolling is to be

13   applied here, it would violate the text of the Texas Medical

14   Liability Act.  The courts in Texas and district courts have

15   said this -- the TMLA, Texas Medical Liability Act, which is

16   codified in Chapter 74 of the Texas Civil Practice and Remedies

17   Code, it has its own statute of limitations.  And it begins

18   with notwithstanding any other law, the statute of limitations

19   is two years.  The courts have interpreted the notwithstanding

20   any other law language to mean equitable tolling does not

21   apply.  It's an absolute statute of limitations.

22           So if we were to read equitable tolling against this

23   text according to the Supreme Court, we can't have equitable

24   tolling apply in this type of situation.  And obviously the

25   TMLA applies to healthcare liability claims.  That's basically

1    a claim brought against a doctor claiming that she was

2    negligent in the care of lack of treatment and this caused

3    injury.  That's obviously the type of claim being brought

4    against Dr. Dhanani.

5             So if we start with the statutory text, I think Texas

6    would say -- or it does say equitable tolling does not apply,

7    it's an absolute.  But even if we step back and look away from

8    the Texas Medical Liability Act, Texas generally recognizes two

9    instances in which the statute of limitations can be extended.

10   It's a discovery rule.  Quickly, the discovery rule does not

11   apply in wrongful death cases.  There's supreme court case

12   authority, I think the statute says that as well.

13            The second one is fraudulent concealment.  Fraudulent

14   concealment is when a plaintiff -- well, a fraudulent

15   concealment claim, a plaintiff must prove the defendant

16   actually knew a wrong occurred and then concealed that wrong.

17   There is no allegations that Dr. Dhanani knew of a wrong or

18   that she concealed the records here.

19            So the general exceptions in Texas for equitable

20   tolling aren't present.  Plaintiffs instead rely on diligence.

21   In this supreme court case, El Pistolon, the --

22            THE COURT:  Diligence in terms of...

23            MR. KNUDSEN:  Pursuing the claim.  Sorry.

24            THE COURT:  Pursuing the identity to then name a

25   person.

```
1              MR. KNUDSEN:  Correct.

2              THE COURT:  That's what you mean.  Okay.

3              MR. KNUDSEN:  Correct.  Yes, Your Honor.  Sorry.

4              THE COURT:  As opposed to not her diligence at the

5    time of diagnosing anything.

6              MR. KNUDSEN:  No, no, no.

7              THE COURT:  This is just as to the limitations issue.

8              MR. KNUDSEN:  Correct, Your Honor.

9              THE COURT:  Okay.

10             MR. KNUDSEN:  So I believe Plaintiffs have argued

11   that the Plaintiffs exercised diligence in pursuing the records

12   to determine identity and that that is a justification for

13   equitable tolling.

14             The supreme court in El Pistolon says diligence alone

15   is not sufficient in the State of Texas.  And we have addressed

16   three cases cited by Plaintiff.  Each one kind of goes back to

17   the argument that diligence is sufficient, and the supreme

18   court has said diligence is not sufficient.

19             And then even if diligence alone was sufficient,

20   which we argue it's not, we would state that there was not

21   diligence here, Your Honor.  According to the evidence

22   submitted to Plaintiffs with Plaintiffs' motion for leave, it

23   looks like the Wards first requested records back in February

24   of 2022.  This was denied by the County.  And then as early as

25   March 23rd, 2022 the attorney general's office said there was
```

```
 1    justification for withholding the records in their law

 2    enforcement (indiscernible).  Suit isn't filed until another

 3    year after that, Your Honor.

 4            So typically what I see in civil rights cases is when

 5    plaintiffs are forestalled from getting records by the County,

 6    they do one of two things.  They go ahead and file suit against

 7    the county and start discovery and say we have not been able to

 8    get the records but we have enough to think that there's a

 9    cause of action, and then they file suit, start the discovery.

10            THE COURT:  They did that.

11            MR. KNUDSEN:  they didn't here.  Not for -- until the

12    eve of the limitations.  More than a year after they learned

13    they were not going to get the records.

14            THE COURT:  Okay.  I was just referencing the fact

15    that they did start -- they did initiate litigation within the

16    limitation periods itself.

17            MR. KNUDSEN:  They did, Your Honor.

18            THE COURT:  Against Harris County.  Just not against

19    the individuals.  Okay.

20            MR. KNUDSEN:  Right.  And I guess there's two periods

21    of lack of diligence we would argue.  In filing the lawsuit,

22    when it was rejected, the request for records was rejected,

23    there was a delay in a year before even filing this lawsuit.

24    And then after that.  I am not aware, Your Honor, of there

25    being any discovery motions before this Court to seek these
```

1    records, to seek the identity of those involved.  Instead, we

2    have a delay of 14 months before Plaintiffs seek leave to add

3    Dr. Dhanani.

4            The other thing that claimants will also do is file -

5    - in Texas there is an avenue for seeking a pre-suit

6    deposition.  They use that procedural avenue to pursue not only

7    deposition testimony of custodians, but also the records

8    themselves.  And that was not utilized here, Your Honor.

9            So diligence alone isn't sufficient, but --

10            THE COURT:  But how is that different than public

11    records requests where they're being told by the county we're

12    not giving that information to you?  I mean, I hear that they

13    didn't seek a pre-suit depo, but are you saying, well, they

14    should have just litigated that in front of me as opposed to

15    pursuing other legal process to get that information and are

16    being told no until they're told not no, and then they amend

17    their complaint?

18            MR. KNUDSEN:  Right.  It wouldn't be by you, Your

19    Honor.  I think it's -- what I have seen is in the state court

20    they file these petitions for Rule 202 depositions when they

21    have been forestalled by the county through a FOIA.

22            THE COURT:  Entirely pre-suit.  Yeah.  Okay.  I see

23    what you are saying.

24            MR. KNUDSEN:  So there are procedural mechanisms by

25    which you could go to obtain these records before suit.  And

```
 1   then filing suit also provides discovery avenues.  Even if a
 2   suit was stayed because of qualified immunity grounds, I think
 3   there are certainly exceptions that would allow for the Court
 4   to order records if there is a concern that additional
 5   defendants need to be added.  But this suit against Dr. Dhanani
 6   was not filed for 14 months afterwards.  And so we don't
 7   believe that constitutes diligence in this instance, Your
 8   Honor.
 9            And so the suit against Dr. Dhanani is barred by the
10   statute of limitations and Dr. Dhanani is requesting that she
11   be dismissed.
12            THE COURT:  Let me ask you if you've thought about
13   this angle.  I'm -- back from our first discussion.  So it's
14   not a medical malpractice claim that's being brought here.
15   It's for deliberate indifference under Section 1983.  She can
16   only be -- and it is a she, right?
17            MR. KNUDSEN:  She, yes.
18            THE COURT:  And she can only be sued in this action
19   in this context under Section 1983.  That does not allow for a
20   simple medical malpractice claim but for her deliberate
21   indifference.  So she is able to be sued because of her
22   relationship with the state and acting as a state actor under
23   Section 1983, but she is not allowed to assert qualified
24   immunity.  I'm just making sure that we've thought that all the
25   way through.
```

```
 1              MR. KNUDSEN:  It's confounding to me as well, Your
 2    Honor.  Because I --
 3              THE COURT:  Yeah.  That seems very curious to  me.
 4              MR. KNUDSEN:  Yes, it is.  And I can forward Your
 5    Honor the case.  Unfortunately, I don't know if I want to --
 6    but it is --
 7              THE COURT:  Well, that's not raised in front of me.
 8              MR. KNUDSEN:  Right.
 9              THE COURT:  But I'm still just trying to square the -
10    - because I still have to think about -- I mean, it's all in my
11    mind because you're characterizing it as a healthcare liability
12    claim.  But that claim can't be brought under Section 1983.  So
13    if that's all it is, it's dismissed on the merits.  Instead,
14    it's deliberate indifference under Section 1983.  So I don't
15    think that I really look at the statute that's specific to
16    healthcare liability claims.  And because that's much more
17    strict.  I mean, it doesn't even allow for equitable tolling as
18    I understand it.  But instead, I'm kind of in a different world
19    that's just what's the usual statute of limitations as to any
20    state actor, which is then why I came around to, right, as to
21    any state actor.  But any state actor would get to also assert
22    qualified immunity.  But she can't do that.
23              MR. KNUDSEN:  Right.
24              THE COURT:  So I'm just trying to make sure I'
25    looking at it in all the right angles.
```

```
 1            MR. KNUDSEN:  No, that relationship is a little bit,

 2   like I said confounding to me, that you could be a contractor

 3   of the state and be entitled to the heightened proof elements

 4   of a 1983 claim but then not be provided qualified immunity.

 5            The only reason we bring up the healthcare liability

 6   claim category is because Texas says when you're going to look

 7   at equitable tolling, we have to look for whether an equitable

 8   tolling principle would conflict with Texas statute.  And you

 9   look at the relevant statute.  And here the relevant statute

10   would be the Texas Medical Liability Act, which then provides

11   the absolute two years.

12            THE COURT:  Okay.

13            MR. KNUDSEN:  So we're not claiming it's a healthcare

14   liability claim in this case, we're just claiming that is the

15   relevant statute when looking to equitable tolling.

16            THE COURT:  Okay.  All right.  Thank you.  Mr.

17   Hawkins?

18            MR. HAWKINS:  Your Honor, a few points in response.

19   Dr. Dhanani cites the Pistolon case for the proposition that

20   equitable tolling is not permitted in Texas.  That is not what

21   the Pistolon case says, Your Honor.  Pistolon says that based

22   on the facts of that case, equitable tolling was not warranted.

23   And that was a completely dissimilar set of facts, Your Honor.

24   I believe the question was whether or not when a claim was

25   dismissed whether the statute of limitations would be tolled
```

1    while the claim was on appeal.  And the court assessed a five-

2    factor test under equitable tolling, Texas's equitable tolling

3    doctrine.  And one of those factors was diligence, Your Honor.

4    And the court concluded that simply that factor did not make

5    sense in this analysis.  And it ends up not applying equitable

6    tolling.  But I think that's still important because Pistolon

7    expressly recognizes that equitable tolling exists in the State

8    of Texas, Your Honor.

9         Second, Your Honor, Dhanani cites to the Bagley case

10   for the proposition that this claim is governed by the TMLA.

11   Other than the Bagley case, Your Honor, Dhanani does not cite a

12   single state or federal case for the proposition that the TMLA

13   framework governs a Section 1983 claim, particularly the

14   statute of limitations framework.

15        Your Honor, Bagley dealt with a very narrow set of --

16   a very narrow question as to whether or not the expert report

17   requirement under TMLA applied to Section 1983 claims brought

18   in state court.

19        And, Your Honor, I would direct you to footnote 9 of

20   that case where the court expressly says it's limiting its

21   holding to that issue because there are obvious issues of

22   federal preemption when a state medical malpractice framework

23   is imposed on Section 1983.

24        THE COURT:  On Section 1983, yeah.

25        MR. HAWKINS:  Right, Your Honor.  And again, Dhanani

 1    does not cite a case for that proposition that the framework of

 2    the statute of limitations governs.  And I think we can all

 3    think of the limitations issue there of when state malpractice

 4    claims start to subsume 1983 claims.  At the end of the day,

 5    Your Honor, this claim is for a violation of Rory's

 6    constitutional rights.  He had a Fourteenth Amendment right to

 7    receive adequate medical treatment, and he did not receive

 8    that.  And that's why this suit is before you today, Your

 9    Honor.  It is not a state malpractice claim.

10          And as to diligence, Your Honor, the family was very

11    diligent.  Four days after our clients got an amended death

12    certificate that said their son had been murdered, they sent

13    open records request to the state and to the county.  And those

14    records were denied, Your Honor.  The mother of their son

15    sought those records and the county denied them.  And over the

16    next year-and-a-half, Your Honor, they served a total of five

17    open records requests, all of which were denied.

18          What's critical here, Your Honor, and what Dhanani

19    fails to address, is that the Wards could not have known that

20    this happened to their son.  The records were the only things

21    that revealed to them that their son was not given proper

22    treatment and died as a result.

23          And so, Your Honor, for that proposition, I would

24    point you to the Lewis case where Judge Rosenthal found that

25    when an open records -- a family of a decedent that had served

1    an open records request and then later amended after the

2    limitations period had ended to add a medical provider to the

3    lawsuit that they had discovered in the course of the lawsuit,

4    Judge Rosenthal found that the family had acted diligently

5    because they served an open records request, and Judge

6    Rosenthal emphasized that the family had no other means to know

7    what had happened to their son.  And that's comparable here,

8    Your Honor.

9         And as for the timeline Dr. Dhanani raises, this

10   timeline actually, Your Honor, is almost identical to the Lewis

11   case.  From the first open records request to filing the

12   lawsuit was 16 months in both cases.  From the suit to the

13   amendment was 13 months in Lewis and 14 months here, Your

14   Honor.  And from the injury to amendment total was 31 months in

15   Lewis and 38 here.

16        Your Honor, I would -- the Wards would advance that

17   the Lewis case and the Heckford case with Judge Ellison make

18   clear that they acted diligently, which Mr. Butt admitted the

19   family acted diligently to discover this and could not discover

20   it any sooner.  And that's why the amendment happened after the

21   statute of limitations period.

22        THE COURT:  Okay.  Thank you.  Mr. Knudsen, anything

23   further?

24        MR. KNUDSEN:  Yes, Your Honor.  I would just

25   encourage the Court to look at the Pistolon case.  It does go

```
 1    through a five-factor test suggested by the Dallas Court of
 2    Appeals, but certain the supreme court did not adopt that test.
 3    What it is go by, well, even if we're going to look at these
 4    factors, it does not meet this.  But one of those factors is
 5    diligence, Your Honor.  And unequivocally the supreme court
 6    says diligence alone is not sufficient under equitable tolling
 7    to -- it's not sufficient to establish equitable tolling under
 8    Texas equitable tolling principles.
 9            Bagley is a Chapter 7 court expert report issue,
10    that's a procedural aspect.  And again, we aren't arguing that
11    this is a medical malpractice case governed by state law.  What
12    we are arguing is that in doing the equitable tolling analysis,
13    the courts look to Texas law and that's where we begin with
14    looking at the statutory text to determine if the
15    (indiscernible) that statutory test.
16            THE COURT:  Okay.
17            MR. KNUDSEN:  And that's where the argument regarding
18    the TMLA comes in.
19            And there was another aspect of obtaining records.  I
20    followed up while we were sitting here.  Mr. Ward I think went
21    to Ben Taub.
22            THE COURT:  Say that again?  Oh, okay, went to Ben
23    Taub.
24            MR. KNUDSEN:  Mr. Ward went to Ben Taub.  I don't
25    know whether those records were requested early on and
```

1  (indiscernible) here.  But there are lots of avenues that were

2  not utilized to determine the parties involved.  So we argue,

3  Your Honor, that deliberate -- or due diligence has not been

4  satisfied.

5          THE COURT:  What are the five factors that are listed

6  in Pistolon?  Between the two of you all I hope we have all of

7  them.

8          MR. KNUDSEN:  Sure, Your Honor.  Let me see if I can

9  find it.

10          MR. HAWKINS:  I do not have it with me, Your Honor.

11          THE COURT:  Okay.

12          MR. KNUDSEN:  And I can provide Your Honor

13  (indiscernible).

14          THE COURT:  Is it in the footnote itself that you

15  were referring to or was it text that set the out?  If you

16  recall.

17          MR. KNUDSEN:  In our briefing, Your Honor, it was

18  just we made reference to the five factor test, but it didn't

19  set out the actual factors.

20          THE COURT:  You referred to a footnote in that

21  opinion.  What were you --

22          MR. HAWKINS:  Your Honor, sorry, that is the Bagley

23  case.

24          THE COURT:  Bagley.

25          MR. HAWKINS:  The Pistolon case, the five factor test

1   is laid out.  It's called the hand test.  It's laid out in the

2   text of the opinion.

3                THE COURT:  Of which case?

4                MR. HAWKINS:  The Pistolon case, Your Honor.

5                THE COURT:  Right.  And from whatever source do you

6   have the five factors?

7                MR. HAWKINS:  I apologize,  Your Honor, I do not.

8                THE COURT:  Okay.

9                MR. HAWKINS:  Diligence was one of the factors

10  discussed.  And I would be speaking without knowledge --

11               MR. KNUDSEN:  I have it here, Your Honor.

12               THE COURT:  Okay, good.

13               MR. KNUDSEN:   It's -- this is from the Pistolon

14  case, Page 630.  It is lack of actual notice of filing

15  requirement, lack of constructive knowledge of filing

16  requirement, diligence, and pursuing --

17               THE COURT:  Hold on one second.

18               MR. KNUDSEN:  I'm sorry.

19               THE COURT:  Okay.  Diligence.

20               MR. KNUDSEN:  Diligence and pursuing those rights.

21  The fourth is absence of prejudice to the defendant.  The fifth

22  is a plaintiff's reasonableness in remaining ignorant of the

23  notice required.

24               THE COURT:  Okay.  Those appeared all -- they're

25  standalone -- those are all standalone factors.  That's not a

1   five factor test as in you're going to demonstrate that each of

2   the five exist, right?  Those are independently articulated

3   factors.

4        MR. KNUDSEN:  Correct, Your Honor.  The next sentence

5   after listing the factors, it says we think the hand test is an

6   unsuitable lens through which to focus (indiscernible) here.

7   So as I noted several times, the court went on to say that

8   diligence alone -- and it looks at that factor (indiscernible).

9        THE COURT:  Okay.  What's the -- I hear passage of

10  time.  But one of the factors being absence of prejudice,

11  that's actually interesting the first two factors are

12  independent.  The third is somewhat independent.  The fourth

13  and fifth appear to be -- maybe the third, fourth, and fifth on

14  their own would not be sufficient.  But you have sort of

15  assessed them together.

16       But in any event, absence of prejudice.  What's the

17  prejudice to Dr. Dhanani.  I understand that the number of

18  months that are at issue here, but wouldn't I be asserting that

19  later if it's like oh, records were destroyed or witnesses are

20  not available because of the passage of time?  But I don't have

21  an argument like that in front of me right now.

22       MR. KNUDSEN:  No, but I think we have cited several

23  cases in our reply and tried to (indiscernible) Your Honor that

24  whenever a defendant is not entitled to use the state statute

25  of limitations, prejudice is assumed because they are now being

 1   subjected to defense costs (indiscernible) to litigation that

 2   they would not have been had the statute of limitations been

 3   applied.  So just not the passing of time, it's also just --

 4           THE COURT:  I don't know that that's right.  Because

 5   that would be -- there would be no way to overcome what's

 6   called equitable tolling.  Because the reason for the statute

 7   of limitations -- and I'm sure you all -- I've had several

 8   Section 1983 cases that I have dismissed on statute of

 9   limitations grounds.  And I always note the result of this is

10   sometimes harsh, but that's the purpose of the statute of

11   limitations.  That's for the Fifth Circuit itself.

12           But the concept is equitable tolling.  And so it's

13   not just oh, there was a statute and therefore the Defendant is

14   prejudiced in that regard.  It's why it's not equitable to go

15   forward even though it's past the statute.  And I'm not hearing

16   like at this juncture what that reason is apart from the flat

17   date of a statute of limitations itself.

18           MR. KNUDSEN:  And that's where we offered our

19   argument, Your Honor, from the El Pistolon case.  It says a

20   defendant will always be prejudiced to some degree by its

21   inability to rely on the relevant statute of limitations.  And

22   then it goes -- another supreme court case from Texas, Godoy v.

23   Wells Fargo goes on to say the statute of limitations protects

24   courts and the public from the perils of adjudicating stale

25   claims.

```
 1                THE COURT:  Okay.  All right.  Mr. Hawkins, anything
 2     else?
 3                MR. HAWKINS:  Yes, Your Honor, if I may.  As Mr.
 4     Knudsen read a passage from the Pistolon case, made clear as
 5     the Texas Supreme Court said several times in that case, that
 6     the application of that test did not make sense there.  And
 7     that was because it was a certain procedural posture where
 8     questions of diligence and questions of prejudice just didn't
 9     really make sense.
10                Your Honor, I would raise two other points in
11     response.  First, the Fifth Circuit is clear that you look to
12     the general tolling doctrines of the forum state.  Whether or
13     not the Pistolon case and procedural issue about limitations
14     tolling on appeal, that is not a general tolling doctrine.  And
15     for that, Your Honor, I would point you to the Green v. Doe
16     Fifth Circuit case interpreting Texas as having equitable
17     tolling doctrine and applying it there, Your Honor.  And that's
18     what Heckford and Lewis, Judge Ellison and Judge Rosenthal,
19     relied on, the Green determination that diligence was present
20     and warranted tolling.
21                Your Honor, I would make a third point.  Even if you
22     disagree with all of that, Your Honor, as a judge under the
23     U.S. Constitution, you have a general equitable -- an equitable
24     power.  And Fifth Circuit caselaw has made clear that you have
25     a power to fashion an equitable tolling remedy if you so
```

1    choose.  So even if Texas's tolling doctrine didn't apply,

2    which we say it does, Your Honor, you would still have the

3    ability to toll.

4            And just to clarify for the record, Your Honor, my

5    understanding from the timeline is that our clients received

6    records from the Ben Taub hospital in March of 2024 I believe,

7    March of 2023.  They did receive records from the hospital.

8    But again, Your Honor, this goes back to our primary point, is

9    that they had no idea what had happened to their son.  They

10   knew that their son had been murdered and they knew from the

11   medical records that he had obvious medical injuries, but they

12   did not know that the officers and the medical staff had

13   contributed to that, Your Honor.  And so even if they had

14   received the medical records --

15           THE COURT:  The Ben Taub medical practitioners are

16   not named as defendants here.

17           MR. HAWKINS:  No, Your Honor.

18           THE COURT:  It's -- even with what was disclosed

19   there, it still doesn't have the identities of what brought the

20   individuals that are at issue here into an amended complaint,

21   right?  That information still wasn't gathered until months

22   later.  Right?

23           MR. HAWKINS:  Right, Your Honor.

24           THE COURT:  Okay.  Okay.  I will just note for the

25   record that under Section 1983, which doesn't have its own

1   statute of limitations, I am directed to look to state

2   provisions.  So with all due respect to your assertion of my

3   just free-roaming equitable power, I don't exercise it that

4   way.  But that doesn't displace your argument on the state

5   basis that I really feel like I have to ground it in what's

6   available under state law.  That's how I'm looking at it, as

7   opposed to -- well, I can't do it under state law, but I'm

8   still going to do it as a federal judge.  I don't really rule

9   like that.  Okay?

10          MR. HAWKINS:  Yes, Your Honor.  If I could make one

11  more point.  Wanted to go back to Mr. Knudson acknowledged that

12  the Bagley case, this is the 1983 TMLA case that it had

13  proposed a procedural requirement on Section 1983 claims.  In

14  that case, the court made clear that substantive limitations on

15  1983 were very different.  And we would advance that imposing

16  TMLA's statute of limitations framework that bars tolling would

17  be a substantive limitation on Section 1983 claims.

18          THE COURT:  Right, but that's the medical malpractice

19  claim angle.  And I've talked about that already.  And you've

20  argued that point too already.  Okay.  All right.  Thank you.

21          MR. KNUDSEN:  Your Honor, one more.

22          THE COURT:  Sure.

23          MR. KNUDSEN:  Mr. Hawkins I think asked for a case

24  about equitable tolling applied in a situation similar to this.

25  And Rubalcaba v. Kaestner, it's a Houston First Court of

```
 1    Appeals Case, 981 S.W.2d 369.  And the court of appeals held in
 2    that case that the inability to obtain medical records is not a
 3    basis for equitable tolling.  So we have cited that in our
 4    reply, Your Honor.  I just couldn't remember the name of the
 5    case.
 6              THE COURT:  Court of appeals case?
 7              MR. KNUDSEN:  Yes, Your Honor.
 8              THE COURT:  Okay.  All right.  Now for the nurses.
 9              MR. BUTT:  Your Honor, two nurses --
10              THE COURT:  And you have -- for the nurses we have
11    both statute of limitations and qualified immunity.  You've
12    argued qualified immunity in a different way for the officers,
13    and I think it's a different issue really, like what the
14    qualified immunity would be for nurses.  So I know you're going
15    to argue that.  On statute of limitations, what do you want to
16    add to the argument?  Because it's about the --
17              MR. BUTT:  I'm not going to add anything on the
18    statute of limitations, Your Honor.
19              THE COURT:  Okay, all right.  So just the qualified
20    immunity then from you.
21              MR. BUTT:  So these are licensed vocational nurses.
22    They are not the top of the line registered nurse.  And they
23    work under registered nurses or a doctor like Dr. Dhanani.  And
24    so their ability to diagnose, assess, and do things that are
25    requested by implication in the second amended complaint don't
```

```
 1    exist.  They cleaned the wound and provided the naproxen and

 2    the Pedialyte which the doctor prescribed.  There is no

 3    deliberate indifference under this circumstance for these

 4    vocational nurses, Your Honor, subjective awareness of a

 5    substantial risk of serious harm.  They did what they were

 6    told.  And the doctor is the captain of the ship.  So these

 7    people should not be sued as nurses having shown deliberate

 8    indifference.

 9              THE COURT:  Okay.

10              MR. BUTT:  And the last one was Sirleaf.  That was on

11    the 10th of May.  And Reid and Thomas were on the 8th of May.

12    Of all they are the least culpable.

13              THE COURT:  Who, the first two?

14              MR. BUTT:  The first two.

15              THE COURT:  On the 8th.

16              MR. BUTT:  Sure.

17              THE COURT:  Okay.  What's the -- I'll take it up with

18    Mr. Hawkins on the factual distinctions there.  The visit on

19    the 8th they are there for -- he is there from 3:51 to 5:12.

20    What did he -- what have you -- there's not video of that,

21    correct?  The video picks up after he's discharged from the

22    medical area.  What -- did he vomit there?  Did he fall down?

23    Did he do any of the other things that we've been discussing as

24    potentially concerning?  Like what was manifested there?  We

25    know that he had been body slammed and hit his head.  He was
```

 1    taken to the clinic.  And then do we know what they were told

 2    had happened?  Do we know what it was that they observed?

 3             MR. HAWKINS:  Yes, Your Honor.  The medical records

 4    make it clear what they saw when Rory entered the medical

 5    clinic.  He had an inch-and-a-half laceration on the back of

 6    his head.  He had a black eye with swelling.  He told them that

 7    he had been body slammed and that he had been jumped.  And he

 8    told them that he had ten out of ten head pain, Your Honor.

 9    That's what the medical staff knew, that's what the charting

10    reflects.

11             THE COURT:  Okay.  Keep going with your argument.

12             MR. HAWKINS:  Your Honor, Mr. Butt advances that

13    these nurses could have relied on what Dr. Dhanani did.  We

14    have two responses to that, Your Honor.  First, they --

15             THE COURT:  Everything that they were told was

16    communicated to the doctor.  Did we stipulate that?

17             MR. HAWKINS:  We allege that, Your Honor.  It's in

18    Rory's medical chart.  And so it's our understanding that the

19    doctor was -- so when he came to Nurse Thomas, who did the

20    intake where it notes all of these things, Nurse Thomas then

21    refers her to Dr. Dhanani.

22             THE COURT:  Right.

23             MR. HAWKINS:  And then Dr. Dhanani speaks to Rory and

24    examines him and notes that he has a laceration, notes that he

25    has all of these things.  I can't -- we allege that she was

1    aware of everything in his medical chart.  And then after he

2    saw Dr. Dhanani, he went to I believe Nurse Reid, who cleaned

3    his wound and actually filled the prescription of naproxen and

4    Pedialyte, Your Honor.

5           Unless Your Honor has any other questions on that, I

6    would like to jump back to Mr. Butt's point about the nurses to

7    rely on what Dr. Dhanani did.

8           THE COURT:  Yes, that's what I am considering.

9           MR. HAWKINS:  Yes, Your Honor.

10          THE COURT:  Because it's the doctor that says here's

11   what you need to do.  And the doctor was given the information.

12   Okay.  Right?  And so tell me more.  On their own were they

13   supposed to have done something more to give information to the

14   doctor?  What more then is a nurse to do if a doctor says

15   here's the prescription?  I mean, even if literally, you know,

16   a nurse could be trained enough to be like, man, with this kind

17   of head wound naproxen is not enough.  But that's a nurse

18   talking to a doctor.  So what more is she supposed to do?

19          MR. HAWKINS:  Your Honor, she was supposed -- so

20   Nurse Thomas who did the intake --

21          THE COURT:  And this is also why I was asking what

22   happened in front of them.  Because like as to the officers we

23   were talking, who weren't even medical professionals, I was

24   sort of like what are they seeing that's putting them on notice

25   of things.  So I'm just wondering what are these nurses on

```
 1    notice of that wasn't given to the doctor who then gave him

 2    orders to fill?

 3              MR. HAWKINS:  So first, Your Honor, we would say that

 4    the nurses had their own independent constitutional obligation

 5    to provide Rory with adequate medical care.  In responding --

 6    when Nurse Thomas, when she saw that Rory had ten out of ten

 7    head pain, had been body slammed, had a laceration on the back

 8    of his eye -- back of his head, black eye, that she knew that

 9    he had -- he was facing a serious medical crisis and needed to

10    go to the hospital or receive additional imaging or a number of

11    things, Your Honor.  She could not simply rely on referring to

12    the nurse, Your Honor, because she had her own obligation.  And

13    the same is true of Nurse Reid.  And for that proposition, I

14    would point the Court to the (indiscernible) v. Carter case

15    which is cited in our brief, Your Honor.

16              Where there, Your Honor, a plaintiff was referred to

17    physical therapy and the doctor then instead sent her to a

18    wellness program.  And the doctor was found deliberately

19    indifferent with that.  But so was the nurse who carried out

20    the referenced wellness program.  The Fifth Circuit said that,

21    "Any reasonable nurse" would know that sending him to get

22    physical therapy -- to go to a wellness program in substitution

23    of physical therapy was not enough and not appropriate.  And we

24    would advance that case for here, Your Honor, that the nurse --

25    Nurse Reid knew that naproxen and Pedialyte would be given to a
```

 1    child with a bellyache, was not enough for what they were

 2    seeing and what they were reading.  And we would say the same

 3    for Nurse Thomas as well, Your Honor.

 4              THE COURT:  Okay.

 5              MR. BUTT:  Your Honor, may I respond?

 6              THE COURT:  You may.  And let me ask, for my 4:00

 7    setting, which is a civil matter, are you all both representing

 8    the same client or do we have both sides of the V on this?

 9    Because it's been in a default posture I think to this point.

10              MR. HOLT:  Yes, sir.  We are here on behalf of the

11    Plaintiff.

12              THE COURT:  You all are both here just on behalf of

13    the Plaintiff.

14              MR. HOLT:  Yes.

15              THE COURT:  Let me finish this point with Mr. Butt.

16    I'm going to take you all up very briefly because I just want

17    to make sure that the defendant was not appearing in defaults

18    appropriate.  So you won't have to wait through the rest of it.

19    Give me just a few minutes though.

20              MR. HOLT:  Thank you.

21              THE COURT:  Go ahead, Mr. Butt.

22              MR. BUTT:  So the argument I hear is one of

23    omniscience and hindsight.  And we all now know that this

24    happened, that happened and so forth.  But it's imposing a

25    great deal of knowledge upon a licensed vocational nurse that

1   does not exist.  No authority, no knowledge, no responsibility.

2            THE COURT:  And Mr. Hawkins, just to be sure, their

3   knowledge is based on self-report by Mr. Ward of what happened

4   to him, correct?  Not that there was something in those 90

5   minutes, unlike what happened later, that didn't happen in

6   their presence, right?

7            MR. HAWKINS:  Yes, Your Honor.  We are not alleging

8   omniscience of the nurses.  We are alleging that based on the

9   facts of what they saw as alleged in the medical records, they

10   knew he was facing a serious medical crisis.  And naproxen and

11   Pedialyte were not an appropriate response and that he should

12   have been sent to the hospital.

13            THE COURT:  Okay.

14            MR. HAWKINS:  And for that point, Your Honor, we

15   would cite the Court to the Austin case, where there the

16   plaintiff fell out and vomited and actually received medical

17   treatment, but the officers in that case were still found

18   liable because they didn't respond to the medical crisis at

19   hand, Your Honor.

20            THE COURT:  Right.  And fell down and vomited.  And

21   you also have that connected to the other things that they know

22   had happened.  And that's why I'm asking what did they

23   physically see here.  You know, because a head wound like that

24   also what serious concussion or whatever is going on, you know,

25   it becomes worse over time.  And they're seeing him really at

 1    the earliest of the moments of what might be being manifested

 2    later.  You know, an hour later, two hours later, et cetera.

 3    All right.  So I'm thinking about that.  Anything else?

 4    Otherwise I'm going to just -- this will take all of five

 5    minutes to address this other case.  And then I want to make

 6    some rulings on this.  Okay?

 7              (Recess)

 8              THE COURT:  All right.  I think that's all of the

 9    motions.  So back on the record as to Ward v. Harris County.

10              Anything else on the motions or anything else to

11    argue on behalf of any of the defendants?

12              MR. BUTT:

13              THE COURT:  Anyone?

14              MR. KNUDSEN:  No, Your Honor.

15              THE COURT:  All right.  Plaintiffs?

16              MR. HAWKINS:  No, Your Honor.

17              THE COURT:  All right.  I am going to deny the

18    motions.  I'm going to articulate reasons here.  I'm going to -

19    - and I'll specify some things in my amended entry following

20    the hearing.  But for -- I find the complaint, the amended

21    complaint to be very detailed and specific as to the

22    allegations of liability here against Harris County in its

23    capacity but then also as to each of the defendants.  And

24    actually I'm getting out ahead of myself.

25              As to the nurses that have moved to dismiss, I am

1    going to grant the motion in that regard, but not as to Dr.

2    Dhanani.

3           Even as to the nurses, there are detailed factual

4    allegations as to each.  That's certainly true as to all of the

5    individuals.  But as I'll get to it when I get to the nurses, I

6    just see them in a different place of them receiving

7    information and giving it to their superior, who is a medical

8    doctor who is giving them specific instructions on what to do

9    and they followed those instructions.  And I don't see on them

10   an independent duty to do more based on what they saw.  They

11   reported what Mr. Ward had himself self-reported.  All right.

12          So my amended entry is going to specify that as to

13   the five named defendants who have not had summons and service,

14   Plaintiffs have ten days to give me a notice as to what their

15   intentions may be as to them.

16          I'm going to note that Kendrick Hafford has been

17   served, but did not file a motion to dismiss.

18          As to Harris County, the assertion as to subject

19   matter jurisdiction was withdrawn because that issue was cured

20   with the attachments to the response.

21          As to the assertions on Monell liability, as pleaded

22   and on the record that's available to me here, the sheriff's

23   statements, the TCJS, and the DOJ investigators or reports are

24   sufficient to show -- it's not a written policy, but for an

25   episodic -- is it act or condition -- episodic act or omission

1    they are sufficient.  These are similar enough and near enough

2    in time to show a policy of deliberate indifference with

3    respect to inadequate medical care.  And Judge Ellison -- I'm

4    not relying on the example in Wagner, but Judge Ellison went

5    through these.  And for the reasons that he found, what was

6    known at the time of his decision, which is proximate to the

7    time of the events that happened here, it's enough at least to

8    proceed against the County.

9           There wasn't really much argument as to policymaker

10   and causation, but as to both of those I find that they are

11   established.  And again, on all of these the response briefing

12   from Plaintiffs I am relying on, and they are very thorough.

13          On the officer's motion to dismiss, that's the first

14   time that the statute of limitations comes up.  I find that

15   there were multiple open records requests during the two-year

16   period following his death.  And not just one, but several.

17   And there was continued follow-up on that.  And when the

18   information was obtained, the complaint was amended to identify

19   specific officers and the medical personnel.  It shows

20   diligence.  And I also really can't conceive that going at it

21   in some other way or angle would have gotten the information

22   sooner.  And so I just think that equitable tolling here is

23   appropriate.

24          As to the qualified immunity issue, based on sort of

25   the concerns I noted factually from what's pleaded and then

1   also the pictures, I find that it's enough to show the

2   deliberate indifference.  From the Gaubert case from the Fifth

3   Circuit with respect to prison officials, I look to whether

4   there was a refusal to treat, ignoring of complaints,

5   intentionally treating incorrectly, or engaging in any similar

6   conduct that would clearly evince a wanton disregard for any

7   serious medical needs.

8        And I don't know that it's a refusal to treat or

9   taking intentional conduct to do something incorrectly, but

10  what was visible to them and presenting right in front of them,

11  it was ignored.  And as I said, the pictures that I've seen,

12  they are quite concerning, especially when related to more

13  fulsomely what the video shows was going on, the number of

14  times he vomited, the disorientation he had, the falling to the

15  ground.  While also knowing that he's bleeding from the head,

16  has a black eye, that they knew enough that more treatment was

17  needed, or at least to check and see whether that is

18  information that was within the knowledge of the medical

19  personnel that had seen him already.  Because as we've been

20  talking about this, what they were seeing is not something that

21  appears to have presented to the nurses when they were there.

22       Some of the Defendants' arguments are that the only

23  thing that they knew of were his head laceration and some

24  swelling.  But that's -- and I'm not charging them that they

25  should have had knowledge of that point of an invisible brain

 1    bleed, about what was ultimately diagnosed, but the repeated

 2    instances of vomiting and the several instances of inability to

 3    walk and collapsing to the ground along with his disorientation

 4    is notice of extensive and concerning medical issues that

 5    needed more attention.  And I don't believe that they responded

 6    reasonably to that.  And to the extent it's argued that there

 7    were only conclusory statements about how they violated Mr.

 8    Ward's rights, I find the pleading to be very detailed as I've

 9    noted about what they saw and what they did in response to it.

10          There's not much argument on any of the qualified

11    immunity points as to the clearly established prong.  I do

12    think that it's clearly established that where prison officials

13    are on notice of a prior condition and observes signs of a

14    serious medical complication, they can be liable for a

15    constitutional violation if they're deliberately indifferent to

16    that.  And that's Easter v. Powell and Austin v. Johnson at a

17    bare minimum.

18          As to Dr. Dhanani, there's not a qualified immunity

19    claim brought by her, so I guess I'll hold and reserve on that.

20    But as to -- the only question is as to the equitable tolling.

21    I've already been through the diligence, looking at the

22    Pistolon factors.  Plaintiff lack of notice of filing

23    requirement or plaintiff lack of constructive knowledge of the

24    filing requirement, that's not what's being argued.  It's a

25    combination of diligence, absence of presence, prejudice, and

1    Plaintiff's reason for remaining ignorant, and the diligence

2    and the reason for remaining ignorant are related.  They were

3    diligently trying to find out actually what had happened and

4    was known at the time that he was in custody at the Harris

5    County Jail.  And once they obtained that information, they

6    amended and filed their suit.

7            Nothing about prejudice at this point has been

8    articulated to me apart from the fact that they were --

9    individuals were named beyond the statute of limitations.  So I

10   guess in that respect ruling on statute of limitations is

11   always without prejudice.  If some prejudice is shown and it

12   relates back to all of this, it can be raised to me again.  But

13   I didn't really have argument on that put before me.

14           And as to the nurses, that ruling on the statute of

15   limitation pertains.  As to the qualified immunity, as I noted,

16   I am granting it.  They are licensed vocational nurses.  As

17   best I can understand, on May 8th and I think on May -- I will

18   ask Mr. Hawkins in just a second on the second encounter for

19   that nurse.  But on May 8th, he was there from 3:51 to 5:12.

20   And whatever was reported to them -- and there is no allegation

21   that they didn't take the notes or ask the questions from him

22   for self-report that they weren't supposed to.  That

23   information was passed on to the doctor on duty, who then

24   assessed it and gave instructions.  And I just don't know -- I

25   just don't think that a nurse can be held to some higher

1    standard about deliberate indifference.  Because it's

2    deliberate indifference to their -- well, to Mr. Ward, but it's

3    as to their duties to him.  And as I understand it, they

4    observed their medical duties.  And so I just don't see that

5    within that not quite 90 minutes -- maybe it's right at 90

6    minutes.  No, it's an hour and 20 minutes that anything

7    manifested in front of them or that there was something more

8    that they could have or should have done on his behalf.

9            As to the -- is it two or three days later there's

10   one other nurse that's involved.  Who is that?

11           MR. BUTT:  That's Sirleaf, Your Honor.

12           THE COURT:  Sirleaf?

13           MR. BUTT:  Sirleaf on the 10th.

14           THE COURT:  So what happened on the 10th?

15           MR. HAWKINS:  At 2:29 a.m., Rory was brought to a

16   cell where based on the medical records his wound was cleaned

17   by Nurse Sirleaf.

18           THE COURT:  Okay.  And is there any other -- so she -

19   - I take it was a she -- she was sent there to clean the wound

20   and did so?

21           MR. HAWKINS:  All we have, Your Honor, is we have

22   video footage of him entering a cell and him leaving.  And we

23   have a medical record that's entered around that time saying

24   that she performed the wound cleaning.

25           THE COURT:  Okay.  And anything again for that -- do

1    you have video of that?

2         MR. HAWKINS:  Your Honor, I understand that medical

3    treatment is not videoed.

4         THE COURT:  Okay, that's fine.

5         MR. HAWKINS:  So we just have him going in and

6    exiting.

7         THE COURT:  Anything on the medical records or

8    anything that indicates anything other than that she entered,

9    she was there for a few minutes and cleaned the wound and left?

10   As in he was collapsed on the ground, he vomited in front of

11   me, he did any of that?

12        MR. HAWKINS:  No, Your Honor.  That's not in the

13   medical records.

14        THE COURT:  Okay.  And so again, that's very similar

15   to the others that it sounds like a nurse that is tasked to a

16   medical job that she went and did and didn't see anything

17   necessarily unusual that would rise to the level of a

18   constitutional violation.  So the motion in that regard is also

19   granted.

20        All right.  That's all of the motions.  Discovery is

21   not going on here.  There were motions to stay pending my

22   ruling.  I have now ruled.  But then there's questions of those

23   who have the ability to appeal an in-part ruling from the

24   bench.  And like I said, I will detail some of their notes just

25   so this case can proceed and not await the need for a lengthy

```
 1   opinion.  The second amended complaint is detailed and the
 2   response briefs were very thorough.
 3              In terms of -- do you all want to get back to me
 4   before we set a scheduling order on discovery?  Discovery is
 5   not proceeding right now.  Do we have any pending discovery
 6   requests?
 7              MR. HAWKINS:  No, Your Honor.
 8              THE COURT:  I know you would be anxious to do that.
 9   How do we determine when and the timing of discovery that
10   should begin?  Do you all want to confer about that and give me
11   a report as to that, or does anybody have a suggestion right
12   now?
13              MR. BUTT:  Your Honor, I would propose that we
14   convene and confer about it and then propose.
15              THE COURT:  Sounds great to me.
16              MR. BUTT:  And I will ask the sheriff's office about
17   this missing -- the Detention Officer Hafford and see if
18   there's some kind of snafu about his request for
19   representation.
20              THE COURT:  Okay.  All right.  Thanks.  All right.
21   Confer and in 14 days why don't you all just give me a status
22   report.  And either -- well, what order on discovery or
23   scheduling order you need from me now or is there going to be a
24   pause for any other reason before discovery launches?  Because
25   qualified immunity has been at issue in this case.  Okay?  All
```

1    right?

2              MR. ROSS:  Your Honor, Jonathan Ross.

3              THE COURT:  yes.

4              MR. ROSS:  I just wanted for the record to note that

5    that was Mr. Hawkins' first argument in court.

6              THE COURT:  Oh, very nice, Mr. Hawkins.  Very nice.

7    We need to get the (indiscernible).  I'm just joking.  You

8    don't have to come up.

9              When did you start with the firm, sir?

10             MR. HAWKINS:  November of 2024.

11             THE COURT:  November of 2024.  All right.  Well, that

12   was very well done and very comprehensive.  So, good job.

13             MR. HAWKINS:  Thank you, Your Honor.

14             THE COURT:  Thank you.

15             MS. BRADLEY:  Your Honor, can I introduce you to one

16   of our law school interns?

17             THE COURT:  And actually, there was a request to like

18   meet him after we adjourn here, which I am happy to do.  I

19   trust you all have no problems if I go meet an intern that's

20   working for the County?

21             MR. ROSS:  None, Your Honor.

22             THE COURT:  All right.  If there's nothing else, we

23   are adjourned.

24             CLERK:  All rise.

25          (Hearing adjourned at 4:27 p.m.)

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 25, 2025